UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SCOTT HOLTMAN, | |
| Plaintiff, | Case No. 3:18-cv-00848 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Alistair E. Newbern |
| ANDREW M. SAUL,[1] Commissioner of Social Security, | |
| Defendant. | |

To:     The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

This case was referred to the Magistrate Judge to dispose or recommend disposition of pretrial motions under 28 U.S.C. § 636(b)(1). (Doc. No. 4.) Now pending in this Social Security appeal is Plaintiff Scott Holtman's motion for judgment on the administrative record. (Doc. No. 12.) The Commissioner of Social Security responded in opposition (Doc. No. 14), and Holtman filed a reply (Doc. No. 15). Having considered those filings and the transcript of the administrative record (Doc. No. 8), and for the reasons given below, the Magistrate Judge will recommend that Holtman's motion for judgment be denied and that the decision of the Commissioner be affirmed.

---

[1]     Andrew M. Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Under Federal Rule of Civil Procedure 25(d), he is automatically substituted as the defendant in this action. Fed. R. Civ. P. 25(d).

# I.      Introduction

Holtman filed a Title II application for disability insurance benefits (DIB) on July 8, 2016, at fifty-one years old. (AR 37, 243.) Holtman alleged that, since September 22, 2006, he has been disabled as the result of severe and recurrent major depression, generalized anxiety disorder, panic disorder, post-traumatic stress disorder (PTSD), social anxiety disorder, migraines, hyponatremia, hypertension, sinusitis/allergies, and sleep apnea. (AR 243, 256.) After his application was denied initially and upon reconsideration, Holtman requested a hearing before an administrative law judge (ALJ). (AR 159.) Holtman was represented by counsel at the February 5, 2018 hearing, at which he and a vocational expert (VE) testified. (AR 37.)

In an April 4, 2018 opinion, the ALJ found that Holtman was not disabled and denied his claim. (AR 37–47.) In reaching that conclusion, the ALJ made the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 22, 2006 through his date last insured of December 31, 2009 (20 CFR 404.1571 *et seq.*).

*       *       *

3. Through the date last insured, the claimant had the following severe impairments: major depressive disorder (MDD), posttraumatic stress disorder (PTSD), and substance addiction disorder (20 CFR 404.1520(c)).

*       *       *

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

*       *       *

5. After careful consideration of the entire record, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to

performing only simple, routine tasks; limited to no contact with the general public, only occasional contact with coworkers and supervisors; and able to adapt to only gradual, infrequent workplace changes.

\*     \*     \*

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

\*     \*     \*

7. The claimant was born on December 14, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant had transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

\*     \*     \*

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 22, 2006, the alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(g)).

(AR 39–46.)

The Appeals Council denied Holtman's request for review on August 9, 2018, rendering the ALJ's decision the final decision of the Commissioner. (AR 1.) Holtman timely filed this action on September 7, 2018 (Doc. No. 1), seeking judgment on the administrative record (Doc. No. 12). The Commissioner responded in opposition (Doc. No. 14), and Holtman filed a reply (Doc. No. 15). Holtman raises two arguments on appeal: (1) that the ALJ erred by declining to give Dr. McFerrin's opinions controlling weight and by failing to provide good reasons for the little weight

accorded to them; and (2) that the Commissioner did not carry his burden of proving there are enough jobs in the national economy to enable Holtman to make a successful employment transition. (Doc. No. 13.)

## II.      Review of the Record

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of the administrative record. Accordingly, the Court will only discuss those matters to the extent necessary to analyze the parties' arguments.

## III.     Legal Standard

### A.      Standard of Review

The Social Security Act authorizes the Court to review "any final decision of the Commissioner of Social Security made after a hearing" and "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). When substantial evidence supports the ALJ's decision, that decision must stand even if the record could also support a contrary conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court

may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). However, the substantial-evidence standard does not condone "a selective reading of the record" and instead requires the ALJ to have considered evidence that "'fairly detracts'" from her decision. *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

The Court also reviews the ALJ's decision for procedural fairness, determining whether the ALJ properly followed the law. *Miller*, 811 F.3d at 833. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Failure to follow agency rules and regulations therefore "'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Id.* (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). "The failure to comply with the agency's rules warrants a remand unless it is harmless error." *Id.* at 723 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004)).

### B. Administrative Evaluation of Disability Claims

Title II is an insurance program that "'provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need.'" *Furlo v. Colvin*, No. 14-cv-14392, 2016 WL 146482, at *8 (E.D. Mich. Jan. 13, 2016) (quoting *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988)). To receive DIB, Holtman must establish that he had a "disability," which means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[,]" 42 U.S.C. § 423(d)(1)(A), on or prior to his last insured date, *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *2

n.1 (E.D. Mich. July 9, 2013) (citing 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130). Therefore, the relevant period of analysis for Holtman's claim is September 22, 2006, his alleged onset date, through December 31, 2009, his date last insured. (AR 38.)

ALJs use a five-step analysis to resolve the question of disability:

> At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity; if the claimant is performing substantial gainful activity, then the claimant is not disabled. [20 C.F.R. § 404.1520(a)(4).] At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." *Id.* If the claimant does not have a severe impairment or combination of impairments, then the claimant is not disabled. *Id.* At step three, the ALJ must determine whether the claimant's impairment meets an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled. *Id.* Otherwise, the ALJ will proceed to the fourth step, where the ALJ must assess the claimant's residual functional capacity and past work. *Id.* If the claimant can still perform his or her past relevant work, the claimant is not disabled. *Id.* If the claimant cannot perform past relevant work, the ALJ must determine whether the claimant can make an adjustment to other work at step five. *Id.* If the claimant cannot make the adjustment, the ALJ will find the claimant disabled. *Id.*

*Miller*, 811 F.3d at 835 n.6. Holtman bears the burden through step four, but, at step five, the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate [Holtman's] residual functional capacity [RFC] and vocational profile."[2] *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). The agency may carry its burden at step five by relying on the medical vocational guidelines, also known as "the grid." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (explaining that the grid is designed to simplify decision-making by directing a finding of disabled or not disabled where certain common patterns of vocational factors are present). However, the agency may also carry its burden using VE testimony. *Id.*; *see also Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (explaining

---

[2] "An individual's residual functional capacity is the most the individual can still do despite his or her impairment-related limitations." SSR 16-3P, 2016 WL 1119029, at *11 (Mar. 16, 2016).

that a VE will be able to analyze an individual's particular RFC to "determine the size of the remaining occupational base, cite specific jobs within the individual's [RFC], and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country").

IV.     **Analysis**

Holtman raises two issues on appeal. First, he argues that the ALJ violated the treating physician rule by failing to give Dr. McFerrin's opinions controlling weight and failing to give good reasons for the little weight she did accord them. Second, Holtman argues that the Commissioner did not carry his burden at step five of proving that there are enough jobs in the national economy to enable Holtman to make a successful employment transition. Critical to reviewing the ALJ's decision is the fact that, although Holtman applied for benefits in 2016, his application addresses only the time period from September 22, 2006, to December 31, 2009. Limited to that window, the ALJ's opinion is supported by substantial evidence and neither of Holtman's arguments warrants reversal.

A.     **Dr. McFerrin's Opinions and the Treating Physician Rule**

Dr. McFerrin is a general adult psychiatrist who, until his retirement, regularly treated depression, anxiety, PTSD, schizophrenia, psychosis, and substance abuse disorders. (AR 1108.) Dr. McFerrin treated Holtman for the first time in March 2004 after Holtman was hospitalized for psychiatric reasons. (AR 42, 1108.) Dr. McFerrin diagnosed Holtman with recurrent severe major depression, non-psychotic in nature, with a remote history of alcohol abuse. (AR 1108.) Dr. McFerrin continued to treat Holtman for psychiatric conditions until the doctor retired from practice in 2016. (AR 1108–09.)

On August 8, 2016, in support of Holtman's application for DIB, Dr. McFerrin completed written responses to questions regarding Holtman's mental functioning. (AR 869.) Although two

7

of the form's questions asked about the current state of Holtman's mental limitations, the form did not otherwise restrict Dr. McFerrin's answers to any particular time period, and it appears he answered the questions from his perspective of having treated Holtman until 2016. (AR 869–70.) In explaining how Holtman had improved with treatment—which included prescription of Wellbutrin, Trileptal, and Xanax[3]—Dr. McFerrin wrote that Holtman "has made suicide attempts, lost his business, [and] now is isolated at home and paralyzed by emotional dyscontrol symptoms with panic attacks, flashbacks, anxiety and agoraphobia." (AR 869.) Dr. McFerrin said that he had last seen Holtman on August 2, 2016, and, as of that date, Holtman's memory was adequate, his concentration was moderately impaired, and his social ability was severely impaired. (*Id.*) Dr. McFerrin also responded to several specific questions about Holtman's ability to succeed in a work environment:

> Q: Can Holtman "[r]emember and carry out simple, 1-2 step instructions and maintain a work routine without frequent breaks for stress related reasons?"
>
> A: No, due to "[s]evere anxiety[,] panic attacks[,] and paranoia."
>
> Q: Can Holtman "[m]aintain an ordinary work routine without inordinate supervision?"
>
> A: Yes.
>
> Q: Can Holtman "[m]aintain socially appropriate behavior, hygiene and grooming?"
>
> A: Yes.
>
> Q: Can Holtman "[r]espond appropriately to normal stress and routine changes?"
>
> A: No, because he "decompensates frequently with panic attacks, crying spells or anger and emotional dyscontrol."

---

[3]     Wellbutrin is an anti-depressant, Tripetal is an anti-seizure medication that Dr. McFerrin prescribed as a mood stabilizer, and Xanax is an anti-anxiety medication. (AR 1114.)

Q:      Can Holtman "[c]are for [him]self and maintain independence in daily living tasks on a sustained basis?"

A:      Yes.

Q:      Can Holtman "[m]aintain a work schedule without missing frequently due to psychological issues?"

A:      No.

(AR 870.) In closing, Dr. McFerrin wrote that Holtman "remains virtually housebound at times without the support of his wife who has to work full time. Otherwise, he has lost interest or ability to pursue sedentary projects in his home environment." (*Id.*)

On January 27, 2017, Holtman's counsel conducted a lengthy video interview of Dr. McFerrin that covered Dr. McFerrin's professional background and expertise, his treatment of Holtman, how Holtman's mental illness has prevented Holtman from maintaining employment, and other clinical observations that form the foundation of the doctor's opinion. (AR 1106.) The relevant portions of this interview are discussed below.

The ALJ provided the following analysis of Dr. McFerrin's opinions:

I gave little weight to the highly restrictive medical opinions provided by Dr. James McFerrin (Ex. 10F and 16F) because they were conflicting, based far too heavily upon the claimant's subjective self-reports and complaints of symptoms rather than objective medical findings, and wholly inconsistent with the longitudinal record.

For example, Dr. McFerrin completed a medical source statement in August 2016 in which he opined the claimant was unable to remember and carry out simple, 1-2 step instructions (Ex. 10F). Furthermore, not only did Dr. McFerrin opine the severity of the claimant's mental impairments met the requirements of a listing (though did not specify which one), Dr. McFerrin specifically opined the claimant was markedly limited in his ability to maintain concentration, persistence, and pace during a videotaped statement recorded in January 2017 (Ex. 16F). Yet, Dr. McFerrin also opined in the medical source statement completed in August 2016 that the claimant's memory was unimpaired while his ability to concentrate was simply moderately impaired (Ex. 10F).

Similarly, Dr. McFerrin opined in January 2017 that the claimant was "markedly restricted" in his ability to perform activities of daily living and "would be non-

functional without the assistance of his wife (Ex. 16F)." Yet, Dr. McFerrin previously opined in August 2016 that the claimant was able to care for himself and maintain independence in daily living tasks on a sustained basis (Ex. 10F).

Likewise, Dr. McFerrin opined in August 2016 that the claimant had a "Severe" impairment in his ability to socially interact with others while Dr. McFerrin opined in January 2017 that the claimant's ability to socially interact with others was "certainly marked" because he "is virtually withdrawn from society" and "Limited social interaction is traumatic (Ex. 10F and 16F)." Yet, Dr. McFerrin also opined in August 2016 that the claimant was able to maintain socially appropriate behavior, hygiene, and grooming and maintain an ordinary work routine without inordinate supervision (Ex. 10F).

In addition to the fact that Dr. McFerrin has clearly expressed conflicting medical opinions regarding the severity of the claimant's mental symptoms and the degree to which they impacted his functional abilities, Dr. McFerrin's highly restrictive medical opinions are also inconsistent with the record as a whole, particularly given that the record shows the claimant was able to work, study online and under a master [tobacco] pipe maker, and travel around the country for his pipe making pipe [sic] business, which clearly shows his ability to plan, focus, carry out tasks, and interact with others was no more than mildly or moderately limited.

(AR 44.)

Holtman's objection to the ALJ's analysis of Dr. McFerrin's opinions hinges on whether the ALJ properly applied the treating physician rule. Under that rule, when the opinion of a treating physician[4] concerning the nature and severity of a claimant's condition or RFC is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the ALJ must give that opinion controlling weight in her analysis. 20 C.F.R. § 404.1527(c)(2); *see also Gentry*, 741 F.3d at 727 (explaining that a treating physician's opinion concerning a claimant's RFC is also entitled to deference).[5] The

---

[4]     A treating physician is one who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2).

[5]     At the outset of his brief, Holtman properly cites 20 C.F.R. § 404.1527(c) as providing the rules relevant to weighing medical opinions. (Doc. No. 13.) Later on, however, Holtman cites 20

rationale behind the rule is that a treating physician's opinion is most likely "to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 404.1527(c)(2).

If a treating physician's opinion is not entitled to controlling weight because it is not well-supported by medically acceptable evidence and techniques or because it is inconsistent with the substantial evidence in the record, it should not be automatically rejected entirely. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996). In weighing a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record, the specialization of the treating source, and any other relevant factors. *Gentry*, 741 F.3d at 727; 20 C.F.R. § 404.1527(c)(2)–(6). "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017). Such reasons must be "supported by the evidence in the case record[ ] and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

---

C.F.R. § 404.1527c, which applies to applications filed after March 27, 2017, and is therefore not relevant to this case. (*Id.*) Holtman's reference to § 404.1527c appears to have been inadvertent.

As explained below, the ALJ provided good reasons for her weighing of Dr. McFerrin's opinions. The record strongly suggests that, today, Holtman suffers from incapacitating mental illness. But the ALJ was tasked with determining whether Holtman demonstrated that he had suffered twelve consecutive months of disability between September 22, 2006, his alleged onset date, and December 31, 2009, his date last insured. Although the ALJ did not adequately explain how Dr. McFerrin's opinions were not supported by medically acceptable diagnostic techniques, she emphasized that substantial evidence in the record regarding Holtman's condition during the relevant period—including Dr. McFerrin's notes and Holtman's own testimony—showed, at most, moderate impairment that was inconsistent with Dr. McFerrin's more restrictive opinions from many years later. The ALJ therefore provided good reasons for declining to give Dr. McFerrin's opinions controlling weight. The ALJ's opinion also demonstrates that she considered the required regulatory factors in deciding to give those opinions little weight.

### 1.      Controlling Weight

Holtman's argument that "the ALJ did not even reference the treating physician rule (either by regulation . . . or by name), much less assess whether [Dr. McFerrin's] opinion should be given controlling weight" (Doc. No. 13, PageID# 1834), is without merit. The ALJ stated at the outset of her step-four analysis that she had "considered opinion evidence in accordance with the requirements of 20 C.F.R. [§] 404.1527" (AR 41), which is the regulation that contains the treating physician rule. Further, the ALJ's conclusion that Dr. McFerrin's opinions were "based far too heavily upon the claimant's subjective self-reports and complaints of symptoms rather than objective medical findings, and wholly inconsistent with the longitudinal record" demonstrates that the ALJ considered the factors relevant to the controlling-weight analysis. (AR 44.)

Holtman also argues, citing *Gayheart v. Commissioner of Social Security*, 710 F.3d 365 (6th Cir. 2013), that the ALJ's discussion of Dr. McFerrin's opinions reflects an inversion of the

proper order of analysis. (Doc. No. 13.) The first step in the treating physician rule analysis is to determine whether the treating physician's opinion is entitled to controlling weight because it is well-supported by medically acceptable diagnostic techniques and not inconsistent with the other substantial evidence in the record. If the opinion is not entitled to controlling weight, then the ALJ proceeds to the second step of the analysis and determines what weight the opinion should receive by considering several factors, one of which is the supportability of the opinion. Here, the ALJ's analysis began with a discussion of alleged inconsistencies between Dr. McFerrin's opinions, which is relevant to the supportability of those opinions and not to whether the opinions should be deemed controlling. *See Gayheart*, 710 F.3d at 376 (explaining that "alleged internal inconsistencies between the doctor's opinions and portions of her reports" are properly considered "only after the ALJ has determined that a treating-source opinion will not be given controlling weight"). The Commissioner's response that "it is proper for the ALJ to consider internal inconsistencies in treating physician opinions" misconstrues Holtman's argument, which does not object to consideration of such inconsistencies per se. (Doc. No. 14, PageID# 1863.) Instead, Holtman correctly argues that the ALJ's choice to analyze alleged inconsistencies in Dr. McFerrin's opinions before determining that those opinions are not controlling is at odds with the order of operations prescribed by 20 C.F.R. § 404.1527(c).

However, the Sixth Circuit's finding of reversible error in *Gayheart* was not predicated on the ALJ's failure to follow that order alone. Rather, the court emphasized that the ALJ did not provide good reasons for declining to give the treating physician's opinions controlling weight, which "hinder[ed] a meaningful review of whether the ALJ properly applied the treating-physician rule . . . ." *Gayheart*, 710 F.3d at 377. In Holtman's case, as explained below, the ALJ ultimately provided good reasons for declining to give Dr. McFerrin's opinions controlling weight. Therefore,

her failure to "strictly follow the *Gayheart* template" is not reversible error. *Aiello-Zak v. Comm'r of Soc. Sec.*, 47 F. Supp. 3d 550, 558 (N.D. Ohio 2014).

### a. Medically Acceptable Clinical and Laboratory Diagnostic Techniques

The ALJ's finding that Dr. McFerrin's opinions were "based far too heavily upon [Holtman's] subjective self-reports and complaints of symptoms rather than objective medical findings" implies that those opinions were not the product of medically acceptable diagnostic techniques. (AR 44.) But the Sixth Circuit has cautioned that "[a] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment" and, therefore, "[w]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873–74 (D.C. Cir. 1987)). Further, because "psychology and psychiatry are, by definition, dependent on subjective presentations by the patient," *Allen v. Berryhill*, 273 F. Supp. 3d 763, 774 (M.D. Tenn. 2017) (quoting *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009)), an ALJ should not discount psychiatric evidence "simply because it [is] based on [a patient's] 'subjective complaints[,]'" *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1071 n.3 (6th Cir. 1992). A contrary conclusion would require "'the rejection of opinions by all mental health professionals, in every case.'" *Allen*, 273 F. Supp. 3d at 774 (quoting *Winning*, 661 F. Supp. 2d at 821).

However, an ALJ may properly discount the opinion of a treating psychiatrist if it merely regurgitates the patient's complaints without providing any objective medical observations or analysis. *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 274 (6th Cir. 2010) (holding that ALJ properly rejected treating psychiatrist's opinion where it consisted "mostly of the claimant's

history and complaints" and the doctor had not "conducted any testing or prepared any report or letter explaining any objective medical bases for her opinion"). In the psychiatric context, objective medical evidence includes "medical signs" of "psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." 20 C.F.R. §§ 404.1502(g), 404.1513(a)(1). "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g).

As Holtman argues, Dr. McFerrin's opinions do not simply summarize Holtman's subjective complaints; they include abundant descriptions of the psychiatric signs of Holtman's mental illness. (Doc. No. 13.) The August 8, 2016 opinion notes that Holtman has attempted suicide and is essentially cloistered at home, "paralyzed by emotional dyscontrol symptoms," "panic attacks, flashbacks, anxiety[,] and agoraphobia." (AR 869.) The January 27, 2017 opinion elaborates significantly on that summary, explaining that, since 2007, Holtman has suffered from serious and recurring major depression, PTSD, and generalized anxiety disorder. (AR 1112–13.) Dr. McFerrin also offers detailed descriptions of his impressions Holtman over the course of years of treatment:

> He's a rather intense and ruminative individual. Very thoughtful and extremely bright and someone you think that would be capable of business because he has those capabilities. Unfortunately from the emotional and psychological standpoint, he is extremely fragile and is easily triggered by external minor or major life events, which we finally understood in the context of his post-traumatic stress disorder.

> \* \* \*

> He presents as overly reserved, as being deeply in thought. Sometimes even limited eye contact. You think he's either shy or aloof and he's always measuring and assessing what the individual is thinking or going to say or do to him. So, extremely sensitive and reactive to interpersonal relationships.

(AR 1115–16.) Dr. McFerrin further explains his view in 2017 that, in general, Holtman's affect is "[s]ad and restricted. Restricted in the sense that there's no range, but it's just either sad or intense or thoughtful or sometimes non-communicative. Lost in thought. Lost in his own world." (AR 1116.) The January 27, 2017 opinion lists several other signs of Holtman's mental illness, including "uncontrolled crying spells," "[e]xtreme hopelessness," "[s]evere insomnia," and "weight loss related to his depressive disorder and hypertension." (AR 1108, 1113, 1116.)

The Commissioner's claim that Dr. McFerrin's treatment notes from the relevant period "recorded few objective findings" is also inaccurate. (Doc. No. 14, PageID# 1866.) The notes summarize Holtman's subjective complaints regarding his symptoms, but they also contain Dr. McFerrin's objective observations of Holtman's mood, affect, orientation, judgment, and insight, and evaluate whether Holtman was suicidal or displaying signs of psychosis. (AR 892–97); *see also Jackson v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 657, 670 (S.D. Ohio 2013) (describing therapists' notes as containing their "objective observations of Plaintiff as depressed, anxious, worried, and tearful, as well as Plaintiff's subjective reports of difficulty sleeping, increase in pain, and weight gain of more than 20 pounds in the preceding months"). During the relevant period, Dr. McFerrin never labeled Holtman suicidal or psychotic and the majority of his treatment notes are positive, describing Holtman's mood as stable or his affect as bright. (AR 892–97.) However, there are also notes in which Dr. McFerrin described Holtman's mood as depressive and his affect as sad, anxious, restricted, serious, or intense. (*Id.*) Dr. McFerrin was prescribing Holtman Wellbutrin XL, Xanax, and Tripetal during this time. (AR 888.)

Because Dr. McFerrin's opinions and treatment notes contain ample objective medical observations and analysis, the ALJ's finding that those opinions are not based on "objective

medical findings" is unsupported by substantial evidence. The only reasoning that the ALJ offered to support that conclusion comes in a prior section of her opinion:

> [T]he only notable objective medical evidence found in the record that would even suggest the claimant's ability to perform basic mental work activities through the date last insured were markedly limited were the psychiatric hospitalizations in February 2002 and March 2004 and these occurred 4.5 years and 2.5 years respectively prior to his alleged onset date.

(AR 43.) That analysis wrongly overlooks Dr. McFerrin's substantial observations, made in his opinions and treatment notes, of the psychiatric signs of Holtman's mental illness. It also overlooks Holtman's medication history. *See Dillman v. Comm'r of Soc. Sec.*, 990 F. Supp. 2d 787, 798 (S.D. Ohio 2013) ("Additionally, while the ALJ noted that Plaintiff had not been hospitalized for his depression or PTSD, she failed to acknowledge the many medications Plaintiff takes to treat these conditions, including an antipsychotic medication."). The ALJ thus did not provide good reasons to support her conclusion that Dr. McFerrin's opinions were not based on objective medical findings.

### b.    Consistency with the Substantial Evidence in the Record

The temporal scope of Holtman's claim is critical to the review of the ALJ's analysis of whether Dr. McFerrin's opinions are consistent with the record evidence. During the hearing, the ALJ explained that Holtman's last insured date was December 31, 2009, and stated that, to award Holtman benefits, she would "have to find that [he was] disabled prior to that date." (AR 77–78.) Accordingly, the ALJ's examination of Holtman consisted of "questions going back to that period of time." (AR 78.) In her opinion finding Holtman not disabled, the ALJ lamented that Holtman had not filed his application for disability "until July 8, 2016, almost 10 years after his alleged onset date and more than 6 years after his date last insured." (AR 43.) She then found that there was no evidence in the record "showing [that] the severity of [Holtman's] limitation [was]

anything more than moderate for a period of 12-consecutive months" during the relevant period. (*Id.*)

Focusing her analysis on that timeframe, the ALJ concluded that Dr. McFerrin's "highly restrictive medical opinions" made in 2016 and 2017 were "inconsistent with the record as a whole, particularly given that the record shows [that Holtman] was able to work, study online and under a master pipe maker, and travel around the country for his pipe making pipe [sic] business" before December 31, 2009. (AR 44–45.) The ALJ did not cite the record to support that finding in her analysis of Dr. McFerrin's opinions. However, in a prior section of the ALJ's opinion, she gave "great weight" to Holtman's testimony that, during the relevant period, "he traveled to pipe shows in Kansas City, Chicago, and Richmond and [ ] worked with a master pipe maker in Yuma, Arizona." (AR 43.) *See Biestek*, 880 F.3d at 786 (considering evidence that supported the ALJ's analysis of the treating physician's opinion although the ALJ referenced that evidence in a different context). The ALJ also cited Dr. McFerrin's treatment notes showing that Holtman was attending pipe-making groups in 2009 and highlighted two specific appointments that Holtman had with Dr. McFerrin: an April 10, 2009 appointment in which Holtman "reported 'no depression symptoms,'" and a July 6, 2009 appointment in which Holtman told Dr. McFerrin that he had attended a Fourth of July party. (AR 42–43.)

To the ALJ, Holtman's pipe-making activities, and the record more broadly, demonstrated that his "ability to plan, focus, carry out tasks, and interact with others was no more than mildly or moderately limited." (AR 45.) Holtman disagrees, arguing that his foray into pipe making shows "how his mental impairments prevented him from being successful in what amounted to a 'sheltered workshop' type of work environment." (Doc. No. 13, PageID# 1840.) Holtman argues that the ALJ "cherry-picked the record" to discredit Dr. McFerrin's opinions. (Doc. No. 15,

PageID# 1879.) For instance, Holtman points out that, in discussing his April 10, 2009 appointment with Dr. McFerrin, the ALJ highlighted the absence of symptoms of depression without also noting that Holtman reported being "anxious in public and avoid[ing] people or social situations." (AR 896.) Similarly, Holtman argues that the ALJ wrongly focused on Holtman's statement during the July 6, 2009 appointment that he had attended a Fourth of July party without mentioning Holtman's report of "minimal socialization" and "paranoia" or Dr. McFerrin's observation that Holtman's affect was restricted. (AR 897.)

Holtman is correct that the ALJ did not address in her analysis some evidence from Dr. McFerrin's treatment notes that supports Holtman's claims. But that does not rise to the level of violating the treating physician rule in this case. Substantial evidence supports the ALJ's determination that Holtman's testimony and Dr. McFerrin's treatment notes from the relevant period are at odds with the doctor's later medical opinions; the ALJ thus provided good reasons for declining to give those opinions controlling weight.

Before he began regularly studying pipe making in 2007, Holtman had unsuccessfully pursued work at a friend's bicycle shop and at Nissan. (AR 84–87.) Interpersonal conflict and anxiety brought those jobs to an end. (*Id.*) Holtman was upset that he had lost his jobs at the bike shop and Nissan and "didn't know what was going wrong[.]" (AR 81.) Holtman started working on pipes as a way of finding employment, "but from . . . [his] own home where it was quiet and [he] didn't feel so threatened." (AR 88.) Holtman described the years in which he was learning pipe making as the beginning of his "downfall" and stated that he suffered bouts of "deep depression[.]" (AR 81.) Holtman worked as much as he could (AR 80), but he also "spent a lot of time in bed," "under the covers with the shades drawn[,] . . . holding onto [his] dogs." (AR 90–91.)

However, Holtman also testified that, during this time, he had not yet given up hope; on the contrary, he believed that he would be able to return to full-time work. (AR 78.) Holtman built a small custom pipe studio in his garage and began studying under a local pipe repairman. (AR 80, 275.) Every week or two, Holtman would spend two to three hours at the repairman's house learning how to clean and repair pipes. (AR 80–81.) Sometime before 2009, and on the recommendation of the repairman, Holtman went to Yuma, Arizona to study with a master pipe maker for five days. (AR 80, 88.) Although Holtman was experiencing panic attacks on and off, he attended pipe shows in three difference cities where he sought to sell his wares. (AR 102–03.)

Holtman continued to pursue pipe making until well after his last insured date. In the fall of 2010, Holtman was "invited to work with a group of three other pipe makers." (AR 79, 98.) Holtman accepted, and the group formed a co-op to share expenses and learn from master pipe makers. (*Id.*) Holtman worked with the co-op until the end 2011, when he stopped making pipes on the advice of his accountant that he would need to produce one pipe a day to make a living. (AR 43, 89.) Even at peak production, he was making no more than one per month. (AR 97, 98, 106.) Emotional problems and social conflicts also contributed to Holtman's decision to close the business: Holtman began experiencing "negative type behavior" from his colleagues after he caused the master to ruin a pipe. (AR 89, 99.) In Holtman's work history report, he explained that he stopped working on pipes "because traveling to trade shows/being in crowds/meeting people was a painful experience for [him]." (AR 275.)

Like Holtman's testimony, Dr. McFerrin's treatment notes from the relevant period describe Holtman as struggling with mental illness but still functioning. Several of those notes refer to Holtman interviewing for jobs or otherwise looking for work. (AR 892–894.) And, as mentioned above, the majority of Dr. McFerrin's objective observations of Holtman were positive:

Dr. McFerrin never described Holtman as being suicidal or psychotic and regularly characterized Holtman's mood as "stable" or his affect as "bright." (AR 892–97.) Dr. McFerrin went further in some notes, observing on January 29, 2007 that there was a "marked improvement and stabilization in [Holtman's] mood" and "[n]o mania or depressive experience[.]" (AR 893.) Similarly, on May 22, 2007, Dr. McFerrin documented "insignificant depression[.]" (AR 888.) A May 28, 2009 note reported that Holtman attended a pipe show with his wife in Chicago, where they stayed with friends. (AR 896.) Although, as Holtman argues, the ALJ only explicitly discussed two of Dr. McFerrin's treatment notes, the Court may consider the notes in full in determining whether the ALJ provided good reasons for declining to give Dr. McFerrin's opinions controlling weight. *See Biestek*, 880 F.3d at 786. In the context of the full record from the relevant time period, the ALJ's analysis of Dr. McFerrin's treatment notes is not fairly characterized as unrepresentative cherry-picking. Rather, the ALJ referenced notes that are consistent with the overall trend during the period: namely, that Holtman's mental illness was not debilitating at that time. *Cf. Jackson*, 989 F. Supp. 2d at 670 (concluding that ALJ had failed to show that treating physician's opinion was inconsistent with the record where the "handful of notes" that the ALJ cited to show that the Plaintiff was doing well were "wholly outnumbered by the other records indicating her recurring episodes of depression").

Substantial evidence supports the ALJ's finding that Dr. McFerrin's later opinions were inconsistent with the record from the relevant period. In his August 8, 2016 opinion, Dr. McFerrin characterizes Holtman's social ability as severely impaired and describes him as being "isolated at home and paralyzed by emotional dyscontrol symptoms . . . ." (AR 869.) He also opined that Holtman would not be able to maintain a work schedule without frequent absences caused by his psychological issues. (AR 870.) That may well be true today. Yet, as the ALJ emphasized,

Holtman's testimony and Dr. McFerrin's treatment notes from the relevant period describe Holtman as regularly engaging in activity outside the house related to his work. In his January 27, 2017 opinion, Dr. McFerrin recalls that, by 2007, he had lost hope that Holtman would be able to maintain full-time work in even a low-stress job. (AR 1115.) Dr. McFerrin also described Holtman's affect as "[s]ad and restricted." (AR 1116.) But Holtman testified that, during the relevant period, he had not yet lost hope that he would be able to return to full-time work, and, as the ALJ's references suggest, the majority of Dr. McFerrin's treatment notes regarding Holtman's mood and affect from that time are positive. Because the ALJ identified substantial evidence in the record that is inconsistent with Dr. McFerrin's opinions, she provided good reasons for declining to give those opinions controlling weight.

### 2.      Weighing the Opinion

When a treating physician's opinion has been deemed non-controlling, it should not be discounted immediately and may still be entitled to great weight. The ALJ must consider several factors in weighing a treating physician's opinion, including the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record, and the specialization of the treating source. "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek*, 880 F.3d at 785.

Despite Holtman's contrary argument, the ALJ provided good reasons for according Dr. McFerrin's opinions little weight. Holtman is correct that some of the inconsistencies in Dr. McFerrin's opinions cited by the ALJ are resolved when they are read in context.[6] But the ALJ

---

[6]      For instance, there is no inherent tension between Dr. McFerrin's August 8, 2016 opinion regarding Holtman's ability to concentrate and his statement in the January 17, 2017 opinion that

adequately supported her conclusion that Dr. McFerrin's opinions were inconsistent with the other evidence in the record. Further, although the ALJ did not explicitly analyze the remaining regulatory factors, her reasoning shows that she adequately considered them. *See id.*; *Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 248 (6th Cir. 2016) (holding that the reasons the ALJ offered for finding the treating physician's opinion non-controlling demonstrated that the ALJ applied the appropriate regulatory factors). The ALJ noted that Holtman "maintained mental treatment" after being discharged from the hospital in March 2004 and cited Dr. McFerrin's treatment notes. (AR 42.) This indicates that the ALJ was aware that Dr. McFerrin was a mental health doctor who had treated Holtman since that time and considered Dr. McFerrin's specialty as well as the length, nature, and extent of his treatment relationship with Holtman.

Because the ALJ provided good reasons for her weighing of Dr. McFerrin's opinions, she did not violate the treating physician rule.[7]

---

Holtman's failure to "continue semi or unskilled work" demonstrates that he has been markedly limited in his ability to "maintain[ ] concentration, persistence, or pace[.]" (AR 1119.) An assessment of a person's ability to concentrate is not the same as an assessment of that person's ability to maintain concentration, persistence, or pace. The latter is a broader category and one of the four areas of mental function that the SSA analyzes to determine if a claimant meets or medically equals one of the listed impairments. *See* 20 C.F.R. § 404, subpt. P, app. 1, § 12.00(E)(3) (explaining that the ability to concentrate, persist, or maintain pace encompasses the ability "to focus attention on work activities and stay on task at a sustained rate").

[7]      Holtman also claims, with almost no supporting argument, that the ALJ "play[ed] doctor" by "craft[ing] her own RFC opinion based on nothing more than her own medical opinion." (Doc. No. 13, PageID# 1841.) Holtman does not cite the record to support this argument, and instead claims that "even a cursory review" of the ALJ's decision will confirm Holtman's position. (*Id.*) Holtman has waived this argument by failing to develop it. *See Bailey v. Colvin*, No. 3:15-cv-00815, 2016 WL 4559972, at *7 (M.D. Tenn. Sept. 1, 2016) (collecting cases for the proposition that an undeveloped argument is waived), *report and recommendation adopted by* 2016 WL 572455 (M.D. Tenn. Sept. 30, 2016). But even if that were not the case, the argument is without merit. Courts in the Sixth Circuit have warned that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Mitsoff v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 693, 701 (S.D. Ohio 2013) (quoting *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 194 (6th Cir.2009)). "[A]n ALJ may not substitute [her] own medical judgment for that of

## B. The Vocational Expert's Testimony

At step five, the burden shifted to the Commissioner to identify a significant number of jobs in the national economy that Holtman can perform. *Johnson*, 652 F.3d at 651. During the administrative hearing, the ALJ posited a hypothetical individual with the RFC that she ultimately adopted for Holtman and asked the VE whether there are jobs in the national economy that such an individual could perform. (AR 115–16.) The VE identified four different occupations by DOT code and provided the following estimates of the number of jobs in those occupations: 161,099 hand packager jobs (DOT 920.587-018); 347,274 material handler jobs (DOT 929.687-030); 117,561 inspector and hand packager jobs (DOT 559.687-074); and 146,697 house cleaner jobs (DOT 323.687-018). (AR 116.) The ALJ concluded her questioning of the VE by asking whether his testimony was "consistent with the [DOT.]" (AR 117.) The VE responded that it was, and that it was also based on his "observation of jobs as a vocational expert dealing with employers, human resource personnel, doing job analyses, labor market surveys, transferrable skills analysis and [his] education and continuing education throughout 27 years." (*Id.*)

On cross-examination, Holtman's counsel asked the VE to consider the ALJ's hypothetical individual but with certain additional limitations based on Dr. McFerrin's opinions. For example,

---

the treating physician where the opinion of the treating physician is supported by the medical evidence." *Id.* Here, as already discussed, the ALJ adequately explained why Dr. McFerrin's opinions were not supported by the medical evidence in the record. The ALJ then weighed that evidence—including the opinions of other doctors—to craft Holtman's RFC, which is her role under the governing law. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's [RFC] to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 404.1527(d)(2) (explaining that, although ALJs will consider opinions from treating physicians regarding a claimant's RFC, "the final responsibility for deciding [such an issue] is reserved to the Commissioner").

Holtman's counsel posited the ALJ's hypothetical but added that the individual could not remember and carry out one-to-two step instructions and maintain a work routine without frequent breaks for stress-related reasons. (AR 117–18.) The VE responded that such an individual could not perform any jobs in the national economy. (AR 118.) Holtman's counsel also had the following exchange with the VE regarding the VE's job estimates:

> Q: The job numbers you have given, are those for that specific DOT number?
>
> A: The Department of Labor does not give out job numbers for specific DOTs. They give out job numbers for a Census code and it could contain one DOT or many DOTs.
>
> Q: So we do not, in fact, know how many specific jobs there are for either one of these DOT jobs?
>
> A: For specific DOT numbers, no.

(AR 120.) In her written opinion, the ALJ relied on the VE's testimony, finding that it was consistent with the DOT. (AR 46.)

Holtman argues that the VE's testimony was unreliable and that the ALJ's decision to credit that testimony at step five is not supported by substantial evidence. Holtman cites *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018), to support his position, arguing that vocational expert's testimony "fail[s] the reliable methodology test" discussed in that case. (Doc. No. 13, PageID# 1843.) Holtman also argues that the ALJ should not have adopted the VE's testimony because the VE did "not even estimate[ ] the number of jobs in the economy for the identified DOT job titles." (*Id.*)

These arguments are unavailing. As the Commissioner points out, Holtman fails to explain the relevance of *Chavez* to this case. In *Chavez*, the claimant challenged the VE's use of the equal distribution method to estimate the number of jobs available to the claimant in the national economy. *Chavez*, 895 F.3d at 966. According to the Seventh Circuit, that "method operates on

the illogical assumption that all job titles within a particular DOT job group exist in equal numbers in the national economy." *Id.* There is no indication that the VE in Holtman's case employed that method. Further, the *Chavez* court premised its holding that the VE's testimony was unreliable on the VE's repeated failure to explain his preference for the equal distribution method despite being pressed to do so multiple times. *Id.* at 969–70. Here, after the VE explained that the Department of Labor does not provide numbers for specific DOT job codes and that the VE therefore was relying on census data, Holtman's counsel made no further effort to determine the basis of the VE's job estimates; the VE stated they were based on his "observation of jobs as a vocational expert dealing with employers, human resource personnel, doing job analyses, labor market surveys, transferrable skills analysis and [his] education and continuing education throughout 27 years." (AR 117.) *Cf. Chavez*, 895 F.3d at 967 (noting that the VE conceded that his estimates were "not rooted in surveys or job data"). Further, even if *Chavez* were factually analogous, the Sixth Circuit has expressly declined to adopt Seventh Circuit precedent imposing a heightened burden on vocational experts at step five. *See Biestek*, 880 F.3d at 790 (rejecting Seventh Circuit's categorical rule requiring "vocational experts to provide the data and reasoning used in support of their conclusions upon request"), *aff'd*, 139 S. Ct. 1148 (2019).

Nor did the ALJ err by adopting job estimates that did not perfectly correspond to DOT codes. The VE estimated the number of jobs that Holtman can perform in the national economy for certain DOT coded occupations even though the Department of Labor does not provide job data for specific DOT codes. In the absence of such data, the best that the ALJ could do was provide estimates based on census codes, which, as "broader designations than DOT codes, . . . may [contain] numerous DOT-coded occupations." *Guiton v. Colvin*, 546 F. App'x 137, 141 (4th Cir. 2013). To the extent that Holtman is arguing that a VE must provide DOT-code-specific

estimates for the Commissioner to meet his burden at step five, that argument fails. Such a requirement would effectively prevent the Commissioner from ever meeting his burden because job data for DOT-coded occupations does not exist. *See, e.g.*, *Taylor v. Comm'r of Soc. Sec.*, No. 1:16-cv-679, 2017 WL 2927483, at *7–8 (W.D. Mich. July 10, 2017) (citing *Guiton*, 546 F. App'x at 142–43).

Holtman's final argument regarding the VE's testimony also lacks merit. Holtman claims that "[t]he ALJ's hypothetical questions to the VE did not accurately set forth [Holtman's] work-related mental abilities and limitations, and therefore the VE's testimony in response to [those hypotheticals] cannot comprise substantial evidence." (Doc. No. 13, PageID# 1844.) Although Holtman does not specify which limitations the ALJ's hypotheticals should have included, he implies that the hypotheticals should have been based on Dr. McFerrin's opinions. This argument is effectively an effort to relitigate the issue of whether the ALJ's decision not to adopt Dr. McFerrin's opinions is supported by substantial evidence. For the reasons already discussed, it was. Given that finding, there was no error in the ALJ's choice to pose hypotheticals to the VE that were not based on Dr. McFerrin's opinions. *See Infantado v. Astrue*, 263 F. App'x 469, 477 (6th Cir. 2008) (explaining that "ALJ's failure to incorporate [treating physician's] limitations into the hypothetical questions" posed to the VE was not in error where the ALJ's decision to give no weight to treating physician's opinion was supported by substantial evidence).

## V.      Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Holtman's motion for judgment (Doc. No. 12) be DENIED and that the decision of the Commissioner be AFFIRMED.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this

report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 16th day of August, 2019.

ALISTAIR E. NEWBERN
United States Magistrate Judge