**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SCOTT HOLTMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:18-cv-00848** |
| **ANDREW M. SAUL, Commissioner of** | ) | **Judge Aleta A. Trauger** |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Scott Holtman brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. On August 16, 2019, the magistrate judge issued a Report and Recommendation ("R&R") (Doc. No. 16), recommending that the decision of the Social Security Administration ("SSA") be affirmed and that the plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 12) be denied. The plaintiff has filed timely Objections (Doc. No. 25), to which the SSA has responded (Doc. No. 27).

For the reasons discussed herein, the court finds that the Commissioner failed to properly apply the treating physician rule and that the magistrate judge erred as a matter of law in finding that failure to be harmless. The court also concludes that the treating physician's opinion should have been given controlling weight and that the opinion that the plaintiff was incapable of full-time work of any kind during the period of disability is effectively uncontradicted in the record. Because evidence of disability is strong and there is very little evidence to the contrary, the court will reject the R&R, grant the plaintiff's Motion for Judgment, reverse the SSA's decision, and

order an immediate award of benefits, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.     PROCEDURAL HISTORY

Holtman filed his application for DIB on July 8, 2016, alleging disability beginning on September 22, 2006. (Doc. No. 8, Administrative Record ("AR") 243.[1]) The application was denied initially (AR 150) and on reconsideration (AR 157). After a hearing on February 5, 2018, Administrative Law Judge ("ALJ") Angele Pietrangelo issued a decision unfavorable to the plaintiff on April 4, 2018. (AR 34–47.)

The ALJ found that Holtman last met the insured status requirements of Title II of the Social Security Act on December 31, 2009 and that he had not engaged in substantial gainful activity during the period from his alleged onset date of September 22, 2006 through his last-insured date. (AR 38, 39.) The ALJ accepted as a factual matter that Holtman suffers from severe impairments, including "major depressive disorder (MDD), posttraumatic stress disorder (PTSD), and substance addiction disorder." (AR 40.) She found that the plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, or 12.15. The ALJ rejected the plaintiff's treating psychiatrist's assessment that the plaintiff's condition precluded full-time work and, instead, determined that the plaintiff, through the date last insured, had the residual functional capacity ("RFC") to perform a full range of light work at all exertional levels but with the following nonexertional limitations: limited to performing only simple, routine tasks; limited to no contact with the general public, only occasional contact with coworkers and supervisors; and able to adapt to only gradual, infrequent workplace changes." (AR 41.)

---

[1] Page number references to the administrative record are consistent with the Bates stamp number at the lower right corner of each page.

The ALJ found that the plaintiff has past relevant work that was "a composite of bicycle repair . . . and a sales person, sporting goods," but that the demands of this work exceeded his RFC. (AR 45.) Nonetheless, based on the RFC and the testimony of a qualified vocational expert ("VE") at the hearing, and considering the plaintiff's age, education, and work experience, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed during the disability period, including the jobs of "packager, hand" [sic], material handler, inspector and hand packager, and house cleaner. (AR 46.) The ALJ therefore concluded that the plaintiff was not disabled during the relevant time frame.

The Appeals Council denied review on August 9, 2018 (AR 1), making the ALJ's decision the final Agency decision.

The plaintiff filed his Complaint initiating this action on September 7, 2018. (Doc. No. 1.) The SSA filed a timely Answer (Doc. No. 7), denying liability, and a complete copy of the Administrative Record (Doc. No. 8). On November 21, 2018, the plaintiff filed his Motion for Judgment on the Administrative Record and supporting Memorandum, arguing that the ALJ violated the treating physician rule set forth in 20 C.F.R. § 404.1527(c)(2) and that her determination that the plaintiff was not disabled during the relevant time frame was not supported by substantial evidence. He also argued that substantial evidence did not support the conclusion that a substantial number of jobs that he could perform existed in the national economy. (Doc. Nos. 12, 13.) The SSA filed a timely Response (Doc. No. 14), and the plaintiff filed a Reply (Doc. No. 15). On August 16, 2019, the magistrate judge issued her R&R (Doc. No. 16), recommending that the plaintiff's motion be denied and that the SSA's decision be affirmed.

Now before the court are the plaintiff's Objections to the R&R (Doc. No. 25), which largely concern the magistrate judge's disposition of his claim that the ALJ did not properly apply the

treating physician rule. The SSA has responded (Doc. No. 27). The plaintiff filed a Reply. (Doc. No. 30.)

## II.    STANDARD OF REVIEW

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court must review *de novo* any portion of the report and recommendation to which a proper objection is made. Fed. R. Civ. P. 72(b)(1)(C); 28 U.S.C. § 636(b)(1)(C); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). Objections must be specific; a general objection to the R&R is not sufficient and may result in waiver of further review. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). In conducting its review of the objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

In social security cases under Title II or Title XVI, the Commissioner determines whether a claimant is disabled within the meaning of the Social Security Act and, as such, entitled to benefits. 42 U.S.C. §§ 1383(c), 405(h). The court's review of the decision of an ALJ is limited to a determination of whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (internal citations omitted).

In addition, an agency's violation of its own procedural rules requires reversal either upon a showing that "the claimant has been prejudiced on the merits *or deprived of substantial rights*

*because of the agency's procedural lapses.*" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citation omitted; emphasis in original). A regulation "intended primarily to confer important procedural benefits upon individuals" "bestows a 'substantial right' on parties before the agency" and must be strictly followed. *Id.* (citations omitted). As discussed below, the so-called treating physician rule (or treating source rule), embodied in 20 C.F.R. § 404.1527(c)(2), confers a substantial right, and an ALJ's failure to comply with it generally requires reversal. *Wilson*, 378 F.3d at 548.

## III.    THE TREATING PHYSICIAN RULE

"The Commissioner has elected to impose certain standards on the treatment of medical source evidence." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c). Generally, a treating-source opinion must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the ALJ finds, based on these criteria, that a treating-source opinion is *not* entitled to controlling weight, then the ALJ must weigh the opinion based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and supported by relevant evidence, *id.* § 404.1527(c)(2)–(6). Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)).

If the treating source's opinion is not given controlling weight, the ALJ must weigh the

opinion in light of several factors. *See* 20 C.F.R. § 404.1527(c) (listing factors). However, "[t]he ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has repeatedly held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given the opinions "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243).[2]

## IV.    THE TREATING PHYSICIAN'S OPINION

The plaintiff did not claim disability relating to any physical impairment, and essentially the only relevant medical source statements or opinions in the record pertaining to his mental

---

[2] On January 18, 2017, the agency published final rules entitled "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844. *See also* 82 Fed. Reg. 15132 (March 27, 2017) (amending and correcting the final rules published at 82 Fed. Reg. 5844). The revised regulations went into effect on March 27, 2017, and specifically apply only to the evaluation of opinion evidence for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," available at: https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html. They therefore do not apply in this case.

disability during the insured period came from James R. McFerrin, M.D., the plaintiff's long-time treating psychiatrist.[3] The R&R provides a comprehensive overview of the August 2016 Medical Source Statement (Exhibit 10F) provided by Dr. McFerrin, which the court adopts verbatim, as follows:

> Dr. McFerrin is a general adult psychiatrist who, until his retirement, regularly treated depression, anxiety, PTSD, schizophrenia, psychosis, and substance abuse disorders. (AR 1108.) Dr. McFerrin treated Holtman for the first time in March 2004 after Holtman was hospitalized a second time for psychiatric reasons.[4] (AR 42, 1108.) Dr. McFerrin diagnosed Holtman with recurrent severe major depression, non-psychotic in nature, with a remote history of alcohol abuse. (AR 1108.) Dr. McFerrin continued to treat Holtman for psychiatric conditions until the doctor retired from practice in 2016. (AR 1108–09.)
>
> On August 8, 2016, in support of Holtman's application for DIB, Dr. McFerrin completed written responses to questions regarding Holtman's mental functioning. (AR 869.) Although two of the form's questions asked about the current state of Holtman's mental limitations, the form did not otherwise restrict Dr. McFerrin's answers to any particular time period, and it appears that he answered the questions from his perspective of having treated Holtman until 2016. (AR 869–70.) In explaining how Holtman had improved with treatment—which included prescription of Wellbutrin, Trileptal, and Xanax[5]—Dr. McFerrin wrote

---

[3] The record also contains medical assessments by two State agency consultants (Exhibits 1A and 4A) to which the ALJ accorded little weight, because the consultants concluded that they did not have sufficient information to assess the plaintiff's mental condition. (*See* AR 131 (noting "no MER for this time period and no ADL evidence"); AR 145 ("There is insufficient evidence to substantiate the presence of the disorder.").)

In addition, the treatment notes and opinion from Licensed Clinical Social Worker Cynthia Jackson (Exhibits 12F, 26F), who began providing counseling and psychotherapy for the plaintiff in 2010 are in the record, but the ALJ accorded little weight to Jackson's opinion "because she lacked firsthand knowledge of the claimant's functional abilities through the date last insured." (AR 45.)

Nonetheless, as discussed below, the ALJ gave "some weight" to a statement by Dr. Ruder (Exhibit 2F), who treated the plaintiff in 2001, insofar as it noted that the plaintiff "responded fairly well to medication" (AR 414), and to a statement by Dr. Kyne (Exhibit 24F), dated January 17, 2002, similarly noting that the plaintiff's "symptoms were markedly reduced during treatment and the prognosis was very good" (AR 45), despite the fact that these optimistic opinions were issued just prior to the plaintiff's first hospitalization in February 2002 for attempted suicide.

[4] As noted above, Holtman was hospitalized in February 2002 after a suicide attempt.

[5] Wellbutrin is an anti-depressant, Trileptal is an anti-seizure medication that Dr. McFerrin prescribed as a mood stabilizer, and Xanax is an anti-anxiety medication. (AR 1114.)

that Holtman "has made suicide attempts, lost his business, [and] now is isolated at home and paralyzed by emotional dyscontrol symptoms with panic attacks, flashbacks, anxiety and agoraphobia." (AR 869.) Dr. McFerrin said that he had last seen Holtman on August 2, 2016, and, as of that date, Holtman's memory was adequate, his concentration was moderately impaired, and his social ability was severely impaired. (Id.) Dr. McFerrin also responded to several specific questions about Holtman's ability to succeed in a work environment:

Q: Can Holtman "[r]emember and carry out simple, 1–2 step instructions and maintain a work routine without frequent breaks for stress related reasons?"

A: No, due to "[s]evere anxiety[,] panic attacks[,] and paranoia."

Q: Can Holtman "[m]aintain an ordinary work routine without inordinate supervision?"

A: Yes.

Q: Can Holtman "[m]aintain socially appropriate behavior, hygiene and grooming?"

A: Yes.

Q: Can Holtman "[r]espond appropriately to normal stress and routine changes?"

A: No, because he "decompensates frequently with panic attacks, crying spells or anger and emotional dyscontrol."

Q: Can Holtman "[c]are for [him]self and maintain independence in daily living tasks on a sustained basis?"

A: Yes.

Q: Can Holtman "[m]aintain a work schedule without missing frequently due to psychological issues?"

A: No.

(AR 870.) In closing, Dr. McFerrin wrote that Holtman "remains virtually housebound at times without the support of his wife who has to work full time. Otherwise, he has lost interest or ability to pursue sedentary projects in his home environment." (*Id.*)

(Doc. No. 16, at 7–9.)

In addition to Dr. McFerrin's August 2016 Medical Source Statement (Exhibit 10F),

Holtman's counsel conducted a lengthy video interview of Dr. McFerrin on January 27, 2017, that covered Dr. McFerrin's professional background and expertise, his treatment of Holtman, how Holtman's mental illness has prevented Holtman from maintaining employment, and other clinical observations that formed the foundation of the doctor's opinion. (AR 1106.) In this interview, the lawyer attempted to focus Dr. McFerrin's opinions on the plaintiff's condition during the insured period, September 22, 2006 through December 31, 2009. The transcript of this interview is in the Administrative Record (Exhibit 16F, AR 1106–22). In it, Dr. McFerrin stated that he had diagnosed the plaintiff with recurring severe depression" that "emerges and affects his daily functioning, his ability to relate to other people, and sometimes even to get out of the house," and with "post-traumatic stress disorder from childhood traumas." (AR 1109.)

Dr. McFerrin noted that, since the onset of the severe depression, the plaintiff had tried to go back to work "quite a number of times," that he was determined to do so, but that, unfortunately, "none of these lasted more than either three weeks to several months." (AR 1110.) Asked what prevented the plaintiff from maintaining a job, Dr. McFerrin explained: "Emotionally and psychologically, he would deteriorate significantly and become non-functional. Non-functional meaning he couldn't get out of the house. He had uncontrolled crying spells. Besides the social withdrawal, it activated or caused suicidal thoughts and tendencies. . . ." (AR 1110.) For example, the plaintiff had obtained a job as a buyer at Nissan in August 2006, just prior to the alleged onset date of September 22, 2006. The plaintiff had been very excited about the job and had held things together to make it through the interview process, but, less than three weeks after being hired, "he had resigned because, emotionally and psychologically, he had decompensated completely. You might say 'the wheels came off the cart.' He was virtually non-functional." (AR 1111.)

Asked specifically to focus on the plaintiff's ability to sustain work activity during the

disability period, Dr. McFerrin stated:

> Well, knowing him since 2004, and up to 2007, he has made multiple attempts. He has tried to work in a higher level corporate setting that lasted less than a month. . . . He has . . . worked at jobs that were either unskilled or semi-skilled . . . and if they were protected . . . he would last a few months, and then, unfortunately, we continued to go through these cycles, repeated cycles of decompensation. So, I haven't seen any, although I'm always hopeful that someone will have a better quality of life, I didn't see any hope after 2007 that he would be able to sustain any reasonable work effort because of these repeated attempts and, unfortunately, we have to say failures at sustaining these.

(AR 1115.)

Asked whether the plaintiff had "marked limitations" in activities of daily living during the relevant time frame, Dr. McFerrin stated: "He is able to take care of his own personal grooming and hygiene. He stays at home. Sometimes limits his driving. At times he is more symptomatic and he is markedly restricted and, in my opinion, would be non-functional without the assistance of his wife." (AR 1118.)

Regarding the plaintiff's ability to maintain social functioning, Dr. McFerrin noted that the plaintiff and his wife had "a very close but limited circle of friends and they can socialize in a very limited way with these people." (AR 1117.) Otherwise, "[h]e is virtually withdrawn from society. He can very infrequently socialize with friends from the distant past that he has known for many years. Limited social interaction is traumatic." (AR 1119.) He agreed that the plaintiff had "marked difficulties" in maintaining social functioning. (*Id.*)

He also opined that the plaintiff had "marked difficulties in maintaining concentration, persistence or pace," explaining: "Yes. He's proven that by not being able to even continue semi or unskilled work." (AR 1119.) Thus, regarding whether he would be able to maintain regular attendance at a job in something akin to a full-time work setting, Dr. McFerrin's opinion was that overall, with a resume, although he hasn't worked in years[,] . . . he would look pretty good on

paper and could probably hold it together for an interview, and then rapidly deteriorate as he had to deal with day-to-day social interactions, and this would occur in days to weeks, not even months." (AR 1119.) As for an ability to interact appropriately with coworkers and supervisors and to accept criticism from supervisors, Dr. McFerrin reiterated that the plaintiff was "very sensitive," even "hypersensitive, to judgment and/or criticism and takes it personally and beats himself up to the point that he emotionally decompensates. It's an extreme reaction." (AR 1120.)

In addition to these opinions, the medical record contains Dr. McFerrin's treatment notes from each of his appointments with the plaintiff from 2004 through 2016. The plaintiff has summarized every treatment note from 2004 through 2009 in Exhibit C to his Objections (Doc. No. 25-3) and has provided a commentated reproduction of Dr. McFerrin's treatment notes during the insured period in Exhibit D (Doc. No. 25-4). Those dating from October 5, 2006 (noting that he had "lost job < 4 weeks – resigned" and that his mood was dysphoric with an "intense/sad" affect (AR 896)) through December 29, 2009 (noting that the plaintiff "continues to isolate himself, not attending groups for pipe mfg, and had a panic attack yesterday" (AR 1683)), are particularly relevant to this case. (Doc. No. 25-3, at 51–60.)

## V. THE ALJ'S CONSIDERATION OF THE TREATING PHYSICIAN'S OPINIONS

The ALJ gave short shrift to Dr. McFerrin's opinions:

I gave little weight to the highly restrictive medical opinions provided by Dr. James McFerrin (Ex. 10F and l6F) because they were conflicting, based far too heavily upon the claimant's subjective self-reports and complaints of symptoms rather than objective medical findings, and wholly inconsistent with the longitudinal record.

For example, Dr. McFerrin completed a medical source statement in August 2016 in which he opined the claimant was unable to remember and carry out simple, 1–2 step instructions (Ex. 10F). Furthermore, not only did Dr. McFerrin opine the severity of the claimant's mental impairments met the requirements of a listing (though did not specify which one), Dr. McFerrin specifically opined the claimant was markedly limited in his ability to maintain concentration, persistence, and pace during a videotaped statement recorded in January 2017 (Ex. 16F). Yet, Dr. McFerrin also opined in the medical source statement completed in August 2016

that the claimant's memory was unimpaired while his ability to concentrate was simply moderately impaired (Ex. 10F).

Similarly, Dr. McFerrin opined in January 2017 that the claimant was "markedly restricted" in his ability to perform activities of daily living and "would be non-functional without the assistance of his wife (Ex. 16F)." Yet, Dr. McFerrin previously opined in August 2016 that the claimant was able to care for himself and maintain independence in daily living tasks on a sustained basis (Ex. 10F).

Likewise, Dr. McFerrin opined in August 2016 that the claimant had a "Severe" impairment in his ability to socially interact with others while Dr. McFerrin opined in January 2017 that the claimant's ability to socially interact with others was "certainly marked" because he "is virtually withdrawn from society" and "Limited social interaction is traumatic (Ex. 10F and 16F)." Yet, Dr. McFerrin also opined in August 2016 that the claimant was able to maintain socially appropriate behavior, hygiene, and grooming and maintain an ordinary work routine without inordinate supervision (Ex. 10F).

In addition to the fact that Dr. McFerrin has clearly expressed conflicting medical opinions regarding the severity of the claimant's mental symptoms and the degree to which they impacted his functional abilities, Dr. McFerrin's highly restrictive medical opinions are also inconsistent with the record as a whole, particularly given that the record shows the claimant was able to work, study online and under a master [tobacco] pipe maker, and travel around the country for his pipe making pipe [sic] business, which clearly shows his ability to plan, focus, carry out tasks, and interact with others was no more than mildly or moderately limited.

(AR 44.)

## VI. THE R&R'S ASSESSMENT OF THE ALJ'S OPINION

The R&R noted that Holtman's objection to the ALJ's analysis "hinges on whether the ALJ properly applied the treating physician rule." (Doc. No. 16, at 10.) The R&R ultimately concluded that, although the ALJ did not strictly apply the order of inquiry prescribed by the regulations and by the Sixth Circuit in assessing Dr. McFerrin's opinions, the ALJ provided the requisite "good reasons" for her determination and that the reasons were supported by substantial evidence in the record.

In reaching that conclusion, the R&R first noted, correctly, that the ALJ "did not adequately explain how Dr. McFerrin's opinions were not supported by medically acceptable diagnostic

techniques," and she concluded that the ALJ "did not provide good reasons to support her conclusion that Dr. McFerrin's opinions were not based on objective medical evidence." (Doc. No. 16, at 12, 17.)[6] The R&R also noted that the ALJ improperly considered purported inconsistencies within Dr. McFerrin's assessments before actually considering whether his opinions should be given controlling weight. *See Gayheart*, 710 F.3d at 376 (explaining that "alleged internal inconsistencies between the doctor's opinions and portions of her reports" are properly considered "only after the ALJ has determined that a treating-source opinion will not be given controlling weight"). The magistrate judge therefore agreed with Holtman that "the ALJ's choice to analyze alleged inconsistencies in Dr. McFerrin's opinions before determining that those opinions are not controlling is at odds with the order of operations prescribed by 20 C.F.R. § 404.1527(c)." (Doc. No. 16, at 13.) The R&R noted, however, that the Sixth Circuit's finding of reversible error in *Gayheart* "was not predicated" solely on the ALJ's failure to follow the order prescribed by the regulation. Rather, the court emphasized that the ALJ did not give good reasons for declining to give the treating physician's opinions controlling weight. (*Id.*) And in this case, the R&R found, the ALJ did give good reasons.

---

[6] The R&R rejected the ALJ's determination that Dr. McFerrin's opinions were "based far too heavily upon [Holtman's] subjective self-reports and complaints of symptoms rather than objective medical findings," noting that the Sixth Circuit has cautioned that psychiatric impairments are "not as readily amenable to substantiation by objective laboratory testing as a medical impairment" and that "psychology and psychiatry are, by definition, dependent on subjective presentations by the patient." (Doc. No. 16, at 14 (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989), and *Allen v. Berryhill*, 273 F. Supp. 3d 763, 774 (M.D. Tenn. 2017)).) The R&R further found that Dr. McFerrin's opinions did not "simply summarize" Holtman's complaints and, instead, comprehensively detailed the objective medical observations and analysis in Dr. McFerrin's notes and opinions. (Doc. No. 14, at 15–16.) The R&R concluded that, "[b]ecause Dr. McFerrin's opinions and treatment notes contain ample objective medical observations and analysis, the ALJ's findings that those opinions are not based on 'objective medical findings' is unsupported by substantial evidence." (Doc. No. 16, at 16–17.) The court agrees with and adopts this assessment.

Specifically, the R&R noted that the "temporal scope of Holtman's claim" was "critical to the review of the ALJ's analysis of whether Dr. McFerrin's opinions are consistent with the record evidence." (Doc. No. 16, at 17.) The ALJ repeatedly noted that, to award benefits, she was required to find disability prior to December 31, 2009, the date last insured. The ALJ lamented that Holtman had waited until July 2016 to file his application for disability, which complicated the analysis. She purported to focus her analysis on the evidence relating to the period of disability preceding the date last insured. As the R&R stated:

> Focusing her analysis on that timeframe, the ALJ concluded that Dr. McFerrin's "highly restrictive medical opinions" made in 2016 and 2017 were "inconsistent with the record as a whole, particularly given that the record shows [that Holtman] was able to work, study online and under a master pipe maker, and travel around the country for his pipe making pipe [sic] business" before December 31, 2009. (AR 44–45.) The ALJ did not cite the record to support that finding in her analysis of Dr. McFerrin's opinions. However, in a prior section of the ALJ's opinion, she gave "great weight" to Holtman's testimony that, during the relevant period, "he traveled to pipe shows in Kansas City, Chicago, and Richmond and [ ] worked with a master pipe maker in Yuma, Arizona." (AR 43.) *See Biestek*, 880 F.3d at 786 (considering evidence that supported the ALJ's analysis of the treating physician's opinion although the ALJ referenced that evidence in a different context). The ALJ also cited Dr. McFerrin's treatment notes showing that Holtman was attending pipe-making groups in 2009 and highlighted two specific appointments that Holtman had with Dr. McFerrin: an April 10, 2009 appointment in which Holtman "reported 'no depression symptoms,'" and a July 6, 2009 appointment in which Holtman told Dr. McFerrin that he had attended a Fourth of July party. (AR 42–43.)

> To the ALJ, Holtman's pipe-making activities, and the record more broadly, demonstrated that his "ability to plan, focus, carry out tasks, and interact with others was no more than mildly or moderately limited." (AR 45.) Holtman disagrees, arguing that his foray into pipe making shows "how his mental impairments prevented him from being successful in what amounted to a 'sheltered workshop' type of work environment." (Doc. No. 13, PageID# 1840.) Holtman argues that the ALJ "cherry-picked the record" to discredit Dr. McFerrin's opinions. (Doc. No. 15, PageID# 1879.) For instance, Holtman points out that, in discussing his April 10, 2009 appointment with Dr. McFerrin, the ALJ highlighted the absence of symptoms of depression without also noting that Holtman reported being "anxious in public and avoid[ing] people or social situations." (AR 896.) Similarly, Holtman argues that the ALJ wrongly focused on Holtman's statement during the July 6, 2009 appointment that he had attended a Fourth of July party without mentioning

Holtman's report of "minimal socialization" and "paranoia" or Dr. McFerrin's observation that Holtman's affect was restricted. (AR 897.)

Holtman is correct that the ALJ did not address in her analysis some evidence from Dr. McFerrin's treatment notes that supports Holtman's claims. But that does not rise to the level of violating the treating physician rule in this case. Substantial evidence supports the ALJ's determination that Holtman's testimony and Dr. McFerrin's treatment notes from the relevant period are at odds with the doctor's later medical opinions; the ALJ thus provided good reasons for declining to give those opinions controlling weight.

(Doc. No. 16, at 18–19.)

In addition to finding that the ALJ provided the requisite "good reasons," the R&R went on to find that "substantial evidence" in the record supported the ALJ's decision to deny benefits, specifically finding that, although he "was experiencing panic attacks on and off," Holtman "attended pipe shows in three different cities where he sought to sell his wares." (Doc. No. 16, at 20 (citing AR 102–03).) The R&R also referenced Holtman's continued efforts to work as a pipe maker in 2010 and 2011. It characterizes Dr. McFerrin's treatment notes as describing Holtman as "struggling with mental illness but still functioning" and even trying to find work. (Doc. No. 16, at 892–94.) And the R&R characterizes "the majority of Dr. McFerrin's objective observations of Holtman" as "positive" insofar as they "never described Holtman as being suicidal or psychotic and regularly characterized Holtman's mood as 'stable' or his affect as 'bright.'" (Doc. No. 16, at 20–21 (citing AR 892–97).) The R&R specifically highlighted treatment notes from January 2007 and May 2007 as indicating "marked improvement and stabilization in [Holtman's] mood," "[n]o mania or depressive experience," and "insignificant depression," and that he attended a pipe show with his wife in Chicago in May 2009. (AR 893, 888, 896.) Similarly, on May 22, 2007, Dr. McFerrin documented "insignificant depression[.]" (AR 888.) While acknowledging that the ALJ had only pointed to two of Dr. McFerrin's treatment notes, the R&R recognized that the court "may consider the notes in full in determining whether the ALJ provided good reasons for

declining to give Dr. McFerrin's opinions controlling weight." (Doc. No. 16, at 21 (citing *Biestek*, 880 F.3d at 786).) The R&R then repeated, for a third time, the conclusion that a "majority" of Dr. McFerrin's treatment notes were "positive." (Doc. No. 16, at 22.) Ultimately, that is, the R&R determined that the ALJ's reference to only two notes in the record did not constitute "unrepresentative cherry-picking," because the referenced notes were "consistent with the overall trend during the period: namely, that Holtman's mental illness was not debilitating at that time." (Doc. No. 16, at 21.)

Finally, the R&R addressed the plaintiff's argument that the ALJ erred in according little weight to Dr. McFerrin's opinions. The magistrate judge acknowledged that Holtman was correct that "some of the inconsistencies in Dr. McFerrin's opinions cited by the ALJ are resolved when they are read in context," but she nonetheless found that the ALJ "adequately supported her conclusion that Dr. McFerrin's opinions were inconsistent with the other evidence in the record" and was not required to explicitly analyze each of the analytical factors enumerated in § 1527, since the opinion reflected that she was aware of how long Dr. McFerrin had treated the plaintiff and that he was a psychiatric specialist, "as well as the length, nature, and extent of his treatment relationship with Holtman." (Doc. No. 16, at 23.)

Finally, the R&R also found that substantial evidence in the record supported the ALJ's conclusion that a substantial number of jobs existed that the plaintiff could perform.

## VII. THE PLAINTIFF'S OBJECTIONS

The plaintiff's Objections are somewhat confusing. Part II of the Objections is entitled "Review of and analysis regarding the R&R." (Doc. No. 25, at 2.) This section emphasizes several findings in the R&R that are favorable to his position, takes issue with a number of factual findings by both the ALJ and the magistrate judge, and argues that the R&R "inexplicably finds no error in the ALJ's reliance on activities outside the 'temporal scope of Holtman's claim' despite the R&R's

repeatedly stated injunction against doing so." (Doc. No. 25, at 10.) Although not clearly explained, this section was apparently intended to provide the factual backdrop and some argument for the plaintiff's actual "Specific objections," which are enumerated in Part III of his Objections. The court construes Section II as providing a preview of, and factual support for, the later-articulated objections.

In addition, the plaintiff attached to his Objections four exhibits (A, B, C, and D). None of these consists of new evidence. Instead, they are effectively demonstrative exhibits highlighting certain evidence that is already in the record. Exhibit A (Doc. No. 25-1) is a chronological list of apparently every mention in the record of the plaintiff's participation in the craft of pipe repair and pipe making, emphasizing the dates on which events occurred. It shows that the plaintiff began trying to learn pipe cleaning and repair in 2004, when he went to Phoenix, Arizona to study with a master pipe maker for three to four days, and that he went to his initial pipe class in 2004. He began trying to learn pipe repair, primarily, during that time frame. He later went to an Introductory Pipe Making School in 2006. After he lost his jobs as a buyer for Nissan, bike salesman, and power-tool salesman, he began trying to work from home, at a "hobbyist level," to advance his skills as a pipe maker/repairman. During the disability period, he found a mentor in Nashville with whom he was able to meet for two to three hours every one to two weeks, and he flew to Yuma, Arizona at some indeterminate time between 2006 and 2009 to study at the home of another master pipe maker for four or five days. Otherwise, he largely tried to work at home by himself, building up a home studio. The plaintiff also added that, during this same time period, he "started becoming overwhelmed and falling into much deeper levels of depression. My anxiety, panic attacks, nightmares and flashbacks had me so overwhelmed that I found myself spending several days at a time in bed, under the covers, with the shades drawn. I became emotionally numb, and social

anxiety was becoming a significant problem . . . ." (AR 228.) The plaintiff also testified that he did not remember making any money at the pipe repair/pipe making endeavor from 2006 through 2009. If he did, it "would have been very small amounts of money," best characterized as "negligible." (AR 81.) He reiterated at the hearing, under questioning by the ALJ, that he was confined to bed "off and on between 2006 and 2009." (AR 81, 90–91.) In May 2009, however, he was able to attend a pipe show in Chicago with his wife. (AR 896.) In other words, in the three years and three months from September 2006 through December 2009, the plaintiff made two trips related to pipe making.

The plaintiff also testified, and the record supports, that, although he had been trying to learn pipe making prior to the end of the insured period, he did not begin working with three others at a pipe co-op until 2010 and did not attend pipe making shows as a seller until 2011, when he attended three shows, in Chicago, Kansas City, and Richmond. In other words, these events, upon which the R&R relies heavily, all took place *after* the date last insured. Moreover, the plaintiff testified that his participation in the co-op did not go well and was very stressful and that the pipe shows were also exhausting and overwhelming for him. (AR 228; *see id.* at 229 ("The coop should have been a safe environment for me but I never felt safe because of my anxiety problems. The longer I was at the coop, the more inefficient I became at making pipes. This caused me great financial stress, which just made everything worse. I repeatedly tried to turn my key to the coop in to the head guy and he kept refusing to accept it. Finally, near the end of 2011 I wrote a check for two months (November and December 2011) and put the check and my key into an envelope, placed it on his desk, and never went back.").)

Exhibit B (Doc. No. 25-2) is a list of seven assertions or findings of fact made by the ALJ in her written opinion, all of which the plaintiff contends are either demonstrably false or grossly

misleading. Most of these are also referenced in Section II. Several of these are simply irrelevant, as they had no bearing on the magistrate judge's decision.[7] Those that are relevant concern the ALJ's (and the magistrate judge's) focus on events that took place outside the insured period (*e.g.*, the plaintiff's participation in the co-op and in pipe shows), to determine his ability to function in a work setting during the insured period, and the ALJ's "cherry-picking" of the evidence in Dr. McFerrin's treatment notes to determine that the plaintiff was not as disabled as he and the doctor claimed, as discussed below.

Exhibit C (Doc. No. 25-3) sets forth, verbatim, every mental health treatment note in the Administrative Record that assesses the plaintiff's mood, affect, and general functioning from 2001 through December 31, 2009, highlighting some portions in bold font. And Exhibit D (Doc. No. 25-4) contains a verbatim reproduction of every one of Dr. McFerrin's twenty-four treatment notes during the insured period, dated October 5, 2006 through December 29, 2009, with plaintiff's counsel's annotation regarding whether each note should be characterized as rating the plaintiff's status as "positive," "negative," or "indeterminate." (Doc. No. 25-4.) This exhibit was created in response to the magistrate judge's finding that "the majority of Dr. McFerrin's treatment notes regarding Holtman's mood and affect from that time are positive" (Doc. No. 16, at 22; *see also id.* at 16, 20), based on their description of Holtman's mood or affect as "stable" or "bright," rather than "depressive," "sad, anxious, restricted, serious, or intense" (*id.* at 16; *see also id.* at 20–21).

_____

[7] For instance, the plaintiff takes issue with the ALJ's finding that he made between $2000 and $3000 in his pipe making endeavor and, therefore, that his "earnings may have risen to substantial gainful activity levels a month or two." (AR 40.) As the plaintiff claims, this is demonstrably untrue. He testified that he made this sum in 2011 and that, during the insured period, made no more than a "negligible" amount, if any. (AR 81.) However, the ALJ also found that the plaintiff had not engaged in substantial gainful activity during the insured period, and the magistrate judge never focused on this issue in finding that the ALJ's decision was supported by substantial evidence, so the error had no effect on either decision.

The plaintiff asserts that, employing the same criteria identified by the R&R, twelve of the twenty-four notes actually must be characterized as "negative," eight as "positive," and a remaining four as "indeterminate." (Doc. No. 25-4, at 1.)

Based in large part upon this backdrop, the plaintiff then articulates eight specific objections to the R&R, as follows:

1. "The R&R impermissibly advances *post hoc rationale* [sic] to affirm the ALJ's decision." (Doc. No. 25, at 14.)

2. "The R&R correctly determined that the ALJ was not supported by substantial evidence [sic] and did not give good reasons for finding that Dr. McFerrin's opinions were not based on 'objective medical findings'; this was reversible error, not harmless error, but the R&R failed to conduct a harmless error review/analysis." (*Id.* at 16.)

3. "The R&R erred in considering evidence regarding Mr. Holtman's post-DLI [date last insured] functioning; this error is inexplicable given the R&R's insistence that such evidence could not be considered." (*Id.*)

4. "The R&R erred in failing to address the multiple false or otherwise misleading statements made by the ALJ in determining that the ALJ's analysis was sound and her decision was supported by substantial evidence." (*Id.*)

5. "The R&R erred in finding that the ALJ complied with the treating physician rule, and in finding that substantial evidence supported the ALJ's failure to accord Dr. McFerrin's opinions controlling weight." (*Id.* at 17.)

6. "The R&R erred in finding that substantial evidence supported the ALJ's decision." (*Id.* at 18.)

7. "The R&R erred in finding that substantial evidence supported the weight (little) that the ALJ gave to Dr. McFerrin's opinions." (*Id.*)

8. "The R&R erred in finding that the VE's testimony carried the ALJ's burden of proving that Mr. Holtman can perform other jobs existing in significant numbers." (*Id.*)

In his Response, the Commissioner argues generally that the plaintiff misapprehends the standard of review and is attempting to seek *de novo* review of the entire record and a fresh consideration of the question of whether he was disabled during the relevant time frame. He also argues that many of the plaintiff's arguments were waived by not being raised in his initial brief,

that he has submitted and relies upon exhibits not properly in the record, and that the magistrate judge correctly concluded that the ALJ's decision was supported by substantial evidence in the record. Finally, he argues that the plaintiff has improperly submitted new "evidence" in the form of exhibits that were not introduced at his hearing before the ALJ or, for that matter, with his Motion for Judgment on the Administrative Record. (Doc. No. 27.)

## VIII. ANALYSIS

First, regarding the Commissioner's objection to the plaintiff's Exhibits A, B, C, and D, as discussed above, these exhibits are effectively demonstrative exhibits that restate *verbatim* aspects of the actual administrative record. They do not present new evidence except insofar as they highlight elements of the record that the plaintiff wishes to emphasize. The court is not precluded from reviewing and considering the plaintiff's exhibits, to the extent they are helpful or relevant to his actual objections to the R&R.

The court also finds that the plaintiff's objections were not, for the most part, waived by not being raised in his original briefing, because they address purported errors made in the R&R. In addition, although the court attempts to address them individually, the first seven objections are essentially one: that the magistrate judge erred in concluding that the ALJ gave good reasons for according little weight to the plaintiff's treating physician's opinions and that substantial evidence in the record supported the ALJ's decision.

### A. The First Four Objections

The first four objections do not warrant reversal and, for the most part, cannot stand on their own as independent objections.

> 1. *The R&R impermissibly advances* post hoc rationale [sic] *to affirm the ALJ's decision.*

The plaintiff argues that a reviewing court, in assessing an agency decision, "must judge

the propriety" of the agency's action "solely by the grounds invoked by the agency." (Doc. No. 25, at 15 (quoting *Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 169 (1962)).) On this basis, he asserts that the court must reject the R&R's "*post hoc* rationalization," specifically referring to the magistrate judge's focus on facts in the record that the ALJ did not cite in support of her decision. He reiterates that this *post hoc* rationalization does not excuse the ALJ's failure to properly consider in the first instance whether Dr. McFerrin's opinion should be accorded controlling weight and failure to provide good reasons for according it little weight.

In response, the Commissioner argues that the law is clear that both the Commissioner and the court, in considering whether an ALJ's decision is supported by substantial evidence, can cite to and rely upon evidence gleaned from "an independent review of the record . . . that lend[s] further credence to the ALJ's finding." (Doc. No. 27, at 5 (quoting *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 438 n.2 (6th Cir. 2012)).) He argues that referring to evidence in the record that supports an ALJ's finding is not the same as providing a "new basis" for the agency action. (*Id.*) Rather, he contends, the magistrate judge "did not provide new reasoning, but merely explained why the ALJ's findings were proper." (*Id.* at 5–6.)

The Sixth Circuit has recognized that "[j]udicial review of the Secretary's findings must be based on the record as a whole" and that a reviewing court "may look to any evidence in the record, regardless of whether it has been cited [by the ALJ] . . . to determine if the ALJ's decision was based upon substantial evidence." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court finds that it was not error, in and of itself, for the magistrate judge to consider the record as a whole to determine whether the ALJ's decision was supported by substantial evidence.

> 2. *The R&R correctly determined that the ALJ was not supported by substantial evidence [sic] and did not give good reasons for finding that Dr. McFerrin's opinions were not based on "objective medical findings"; this was reversible error, not harmless error, but the R&R failed to conduct a*

*harmless error review/analysis.*

The plaintiff simply states that he "objects" to the magistrate judge's failure to conclude that this error by the ALJ constituted reversible error but does not supply additional argument. Because this objection is not sufficiently specific to warrant review, it is overruled. *See Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007) (issues raised in a "perfunctory manner, unaccompanied by some effort at developed argumentation," are waived (quoting *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000))).

> 3.  *The R&R erred in considering evidence regarding Mr. Holtman's post-DLI [date last insured] functioning; this error is inexplicable given the R&R's insistence that such evidence could not be considered.*

Although the plaintiff supplies no argument specifically in support of this objection, he discusses it in the "fact" section of his Objections and provides a detailed timeline of events and citations to the R&R showing that the magistrate judge—and the ALJ—relied substantially upon events that occurred outside the insured period for the determination that the plaintiff was not disabled during the insured period—despite the ALJ's repeated insistence that events that took place outside the period of disability were not relevant. However, this objection is best considered within the context of the plaintiff's arguments that the R&R erred in finding that the ALJ's decision is supported by substantial evidence, which is addressed below.

> 4.  *The R&R erred in failing to address the multiple false or otherwise misleading statements made by the ALJ in determining that the ALJ's analysis was sound and her decision was supported by substantial evidence.*

As discussed above, the plaintiff's "Exhibit B" itemizes seven "assertions" made by the ALJ "that were either demonstrably false or demonstrably misleading." (Doc. No. 25, at 16–17 (citing Doc. No. 25-2).) He contends that the R&R failed to acknowledge that these statements were false or misleading and, instead, repeated the errors, and he argues that "these false/misleading assertions . . . certainly call the ALJ's analysis of the evidence into great

question." (AR 25, at 17.) In response, the defendant argues that the R&R could not have erred in this regard, because the plaintiff did not raise this argument or point out the specific statements to which he objects in his Motion for Judgment on the Administrative Record. The court construes the plaintiff's Reply as arguing that there was no waiver of this issue, because it goes to the heart of whether the ALJ's decision was supported by substantial evidence.

Once again, this argument is relevant as an objection to the R&R only insofar as it pertains to the question of whether the ALJ's decision was supported by substantial evidence and whether the R&R erred in concluding that it was. To the extent the purported misrepresentations and misleading statements are relevant to that determination, they will be addressed in that context.[8]

---

[8] The seven purportedly false or misleading statements are:

1. The ALJ's assertion that the plaintiff made between $2000 and $3000 "making and selling pipes" during the relevant time frame, meaning that his earnings "may have risen to substantial gainful activity levels a month or two" (AR 40);

2. The assertion that "the claimant's participation in a pipe making business certainly indicates an ability to function at a greater level than he has alleged" (AR 40; *see id.* at 43);

3. The ALJ's assertion that, "[s]ince his discharge from hospital in March 2004, the claimant maintained mental health treatment and reported minimal socialization. However, the claimant reported 'no depression symptoms' in April 2009 and he reported in July 2009 that he recently 'went to a 4th of July party'" (AR 42);

4. The ALJ's assertion that "the record does not document any . . . evidence of psychological decompensation since March 2004" (AR 40);

5. The ALJ's reference to Cynthia Jackson's October 2010 note that the plaintiff had been "doing things that put him out in public, in crowded situations (baseball game, concert)," going to a music workshop in November 2010, staying home alone a weekend in December 2010 while his wife visited family, and going to mindfulness and mediation retreats in 2013 (AR 43);

6. The ALJ's assertion that the "only notable evidence" in the medical record showing marked limitations in the ability to work was his hospitalizations in February 2002 and March 2004, "[n]ot to mention [that] these hospitalizations appeared to have been largely related to legal proceedings, the closing of his business, and, by his own admission, excessive drinking" (AR 43); and

7. The ALJ's assertion that the plaintiff testified that "he ultimately closed his business because his accountant advised him it was not profitable." (AR 43.)

### B. The Fifth, Sixth, and Seventh Objections: Violation of the Treating Physician Rule

> 5. *The R&R erred in finding that the ALJ complied with the treating physician rule, and in finding that substantial evidence supported the ALJ's failure to accord Dr. McFerrin's opinions controlling weight.*

> 6. *The R&R erred in finding that substantial evidence supported the ALJ's decision.*

> 7. *The R&R erred in finding that substantial evidence supported the weight (little) that the ALJ gave to Dr. McFerrin's opinions.*

The court considers these arguments together, because they overlap substantially. As the court understands the Objections, the plaintiff is arguing that the magistrate judge erred in finding that the ALJ's decision to accord little weight to Dr. McFerrin's opinion was supported by substantial evidence in the record, first, because the ALJ never considered the factors relevant to a determination of whether to accord controlling weight to his opinion as a treating physician; second, because the ALJ failed to consider or even mention the overwhelming quantity of evidence supporting disability and, instead, relied on a false or misleading characterization of the evidence to conclude that Dr. McFerrin's opinions were not substantiated; and third, because there were no other medical opinions in the record that conflicted with Dr. McFerrin's, the ALJ "substituted her own medical opinion (based on nothing more than her own medical suppositions about Mr. Holtman's functional abilities and limitations . . . )." (Doc. No. 25, at 18.)

As set forth above, at the time of the disability determination, 20 C.F.R. § 404.1527(c)(2) provided that a treating source's medical opinion should be given "controlling weight" if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) it "is not inconsistent with the other substantial evidence in [the claimant's] case record." If a treating source's opinion is not given controlling weight, the ALJ must then weigh the opinion based on

---

(*See generally* Doc. No. 25-2.)

the other factors set forth in the regulation, including the length, frequency, nature, and extent of the treatment relationship, the treating source's area of specialty, and the degree to which the opinion is consistent with the record as a whole and supported by relevant evidence. *Id.* § 404.1527(c)(2)(i)–(ii) and (3)–(6).

In this case, although the ALJ stated that she "considered opinion evidence in accordance with the requirements of 20 CFR 1527" (AR 41), she did not expressly consider either of the § 404.1527(c)(2) factors or decline to accord controlling weight to Dr. McFerrin's opinions based on their failure to satisfy them. Instead, while the ALJ clearly recognized that Dr. McFerrin was a long-time treating physician specializing in psychiatry (thus, implicitly at least, addressing the factors in § 404.1527(c)(2)(i) and (ii) and (c)(5)), she skipped straight to a declaration that she was nonetheless according his opinions "little weight," because they "were [1] conflicting, [2] based far too heavily upon the claimant's subjective reports and complaints of symptoms rather than objective medical findings, and [3] wholly inconsistent with the longitudinal record." (AR 44.) She then went on to address evidence in the record that she believed supported those findings.

That is, the ALJ gave three reasons for according little weight to Dr. McFerrin's opinion. As the magistrate judge determined, however, the first of these reasons was not supported by the record. The magistrate judge recognized that Dr. McFerrin's opinions were not inherently internally inconsistent or inconsistent with each other. (*See* Doc. No. 16 at 22–23 & n.6.) The court agrees that the ALJ's conclusion that Dr. McFerrin's treatment notes were inconsistent with each other is wholly unsupported by the record.[9] In addition, as the magistrate also determined, "Dr.

[9] As the magistrate judge noted, the 2016 form did not limit its scope of inquiry to a particular timeframe. Two of the questions appeared to ask about the plaintiff's then-current status, and Dr. McFerrin appeared to answer the other questions from his perspective of having treated the plaintiff up through 2016. (*See* Doc. No. 16, at 7–8.) The magistrate judge explicitly rejected the ALJ's determination that the doctor's opinion that the plaintiff had moderate difficulty in

McFerrin's opinions and treatment notes contain ample objective medical observations and analysis," as a result of which "the ALJ's finding that those opinions are not based on 'objective medical findings' is unsupported by substantial evidence." (Doc. No. 16, at 16–17.) Thus, the second of the ALJ's three reasons was also not "good."

The ultimate question, however, is whether the ALJ's conclusion that Dr. McFerrin's restrictive opinions were "wholly inconsistent with the longitudinal record" is supported by the record. With regard to that question, the ALJ discussed two of Dr. McFerrin's treatment notes that

---

concentrating in August 2016 inherently conflicted with his conclusion in 2017 that the plaintiff had marked difficulty in maintaining "concentration, persistence or pace" during the insured period. (*See id.* at 22–23 & n.6.)

Although the magistrate judge did not address them, the other purported conflicts found by the ALJ are also easily reconcilable. The ALJ noted that Dr. McFerrin found in 2016 that the plaintiff was able to care for himself and maintain independence in activities of daily living. She believed that this conflicted with his statement in 2017 that the plaintiff was markedly restricted in that arena and would be "non-functional without the assistance of his wife." (AR 44.) In actuality, however, Dr. McFerrin stated in 2017 that the plaintiff was "able to take care of his own personal grooming and hygiene" but that he "stays home," "[s]ometimes limits his driving," and "*[a]t times* he is more symptomatic and he is markedly restricted and, in my opinion, would be non-functional without the assistance of his wife." (AR 1118 (emphasis added).) In other words, the interpretation of what constituted caring for himself appears to have been more broadly construed the second time around. In addition, the record reflects that the plaintiff's condition was up and down; Dr. McFerrin appears to be saying only that, while the plaintiff generally took care of himself, at times he was effectively non-functional, even with respect to activities of daily living.

Finally, Dr. McFerrin stated in 2016 that the plaintiff had a "severe" impairment in his ability to socially interact with others, but also opined that he could maintain socially appropriate behavior. In 2017 he noted that the plaintiff's impairment in that arena was "certainly marked," given that he was "virtually withdrawn from society" and that limited interaction was painful. The court, again, finds no inherent conflict either internally or between the two statements. The fact that social interaction is limited and painful does not imply that the plaintiff is going to take off his clothes, howl like a wolf, or engage in other socially inappropriate behavior when required to socialize. Similarly, Dr. McFerrin's statement in 2016 that the plaintiff could not "remember and carry out simple, 1–2 step instructions and maintain a work routine without frequent breaks for stress related reasons," due to "severe anxiety, panic attacks & paranoia," did not conflict with the "yes" answer, on the very next line, to the question of whether the plaintiff could "maintain an ordinary work routine without inordinate supervision," given particularly the compound nature of the preceding question. (AR 870.)

she believed to be representative of the plaintiff's overall condition, but she referenced only those parts of the treatment notes consistent with her opinion that the record did not support a finding of disability, while ignoring those parts supportive of the plaintiff's position, thus substantially misrepresenting what the treatment notes actually said.[10] In addition, however, she found that: (1) the plaintiff was "apprenticing under a master pipe maker and then running his own pipe making business through the date last insured" (AR 40); was "attending pipe making groups during 2009" (AR 42); "traveled to pipe shows in Kansas City, Chicago, and Richmond and he worked with a master pipe maker in Yuma, Arizona" (AR 43); reported various activities in public as well as staying home alone one weekend while his wife traveled, all during the last quarter of 2010 (AR 43); reported "smiling, laughing, joking" through a therapy session with Cynthia Jackson around the same time (AR 43); and "started meditation and mindfulness training in 2013 where he went on retreats lasting up to five days at a time" (AR 43). The ALJ also found it noteworthy that the plaintiff only closed the pipe making business (in late 2011) because his accountant told him it was not profitable. (AR 43.)

Then, despite referencing and apparently relying upon evidence in the record after the date last insured that the ALJ found *consistent* with an ability to work, the ALJ refused to consider the opinion of the plaintiff's treating psychotherapist from 2010 to 2016 on the basis that she had no first-hand knowledge of the plaintiff's functional abilities during the insured period. (AR 45.) The

---

[10] Specifically, as noted above, the ALJ referenced a treatment note from April 2009 in which the claimant reported "no depression symptoms." (AR 42.) The actual treatment note also documents "anxious in public –avoids people or social situations – less appetite." (AR 896.) The ALJ also cited a treatment note showing that the plaintiff went to a 4th of July party in 2009 as conflicting with the plaintiff's claim that he engaged in minimal socialization. The actual treatment note says "minimal socialization but went to 4th of July party," references "paranoia," and describes the plaintiff's mood as "stable," while his affect was "restricted" and his judgment "limited." (AR 897.) In other words, it is clear from the context that his going to a party at all was an anomaly.

ALJ nonetheless accorded "some weight" to the opinion of Dr. Ruder, who had treated the plaintiff in 2001, well before the alleged period of disability. Although Dr. Ruder provided no information about work-related limitations, the ALJ gave his opinion some weight because it "demonstrate[d] that the claimant's condition was amenable to treatment during the period preceding the date last insured." (AR 45.) The ALJ did not expressly recognize that Dr. Ruder had treated the plaintiff only through the end of 2001 (AR, Ex. 1F), nor did she acknowledge that the plaintiff had been hospitalized in February 2002 in connection with a suicide attempt (AR Ex 21F), just before Dr. Ruder issued the April 2002 opinion to which the ALJ referred, indicating that the plaintiff had "responded fairly well to medications prescribed," had "regained a fairly good level of functioning, and his prognosis was felt to be good" (AR 414).

All of the ALJ's findings are problematic. First, although the plaintiff was working with a master pipe maker during the insured period, his meetings with the pipe maker took place intermittently, no more than once a week, and the record establishes that he was not actually "running his own pipe making business through the date last insured." (AR 40.) At most, during that period, he was attempting to learn the business and engaging in limited pipe repair work, and he made a "negligible" amount of money during this time frame. (AR 79–81.) The evidence does not substantiate the ALJ's conclusion that he was "attending pipe making groups" during 2009. Instead, the few references to pipe making groups in Dr. McFerrin's records indicate only that the plaintiff was not attending the meetings. (AR 1678, 1679.) While he did make a trip to Yuma, Arizona and one trip to a pipe show in Chicago with his wife during the insured period, two trips during more than three years does not approximate an ability to maintain a regular work schedule. He did not travel to pipe shows in Kansas City, Chicago, and Richmond until 2011, well after the date last insured. (*See* AR 102, 1695.) All of the other events the ALJ references took place either

well before or well after the date last insured. And, in addition to that fact, the ALJ substantially misrepresented the extent to which these events demonstrated the plaintiff's well-being.[11]

In other words, all of the ALJ's reasons fall apart upon closer inspection. Dr. McFerrin's opinions were not internally inconsistent; they were not based too heavily upon the plaintiff's subjective self-reports rather than on objective medical findings, and they were not inconsistent with the longitudinal record. The court, therefore, cannot find that the ALJ gave "good" reasons for according Dr. McFerrin's opinions little weight.

The magistrate judge nonetheless rejected the plaintiff's argument that the ALJ had engaged in "cherry-picking," finding that "substantial evidence" in the record supported her rejection of Dr. McFerrin's assessment. In particular, the magistrate judge found it pertinent that Holtman himself had not given up hope during the relevant time that he would be able to return to full-time work, but built a small custom pipe studio in his garage; began studying under a local pipe repairman with whom he spent two to three hours every week or two; went to Yuma, Arizona upon this mentor's recommendation; and attended pipe shows in three different cities. The ALJ also repeatedly characterized Dr. McFerrin's treatment notes as being primarily "positive."

---

[11] For instance, although he reported attending various activities in public during the last quarter of 2010, the ALJ fails to mention that he was left "emotionally 'frazzled,'" "drained" and "exhausted" by these events, which clearly did not represent ordinary activities for him. (AR 1663.) While his wife traveled and left him alone, he was depressed, "isolat[ed] himself," and felt "insecure about wife in her absence." (AR 1661.) One day in April 2012, his mood during a therapy session with Jackson was reported to be "improved" and he was "smiling, laughing" (AR 1630), but this, too, was clearly a departure from the majority of visits in which he was noted to be anxious, overwhelmed, or depressed. (*See, e.g.*, AR 1629, 1633, 1635.) He engaged in Buddhist meditation and mindfulness retreats beginning sometime in 2013, which seemed to help him, but he also experienced a psychological "meltdown" after a five-day retreat in 2016. (AR 1734.) And finally, although the ALJ understood the plaintiff as testifying that he "closed the pipe making business because his accountant advised him it was not profitable (AR 43)," the plaintiff's actual account was much more nuanced. His description of the end shows that his psychiatric problems prevented him from working with the co-op or from finishing pipes quickly enough to make the business profitable. (*See* AR 89, 98–99, 229.)

The court agrees generally with the magistrate judge that the court may make an independent review of the record to determine whether the ALJ's decision that Dr. McFerrin's opinions were inconsistent with the record as a whole was based upon substantial evidence. *Heston*, 245 F.3d at 535. However, as set forth above, it is also clear from the record that the plaintiff did not attend pipe shows in three different cities during the insured period and equally clear that the "majority" of Dr. McFerrin's treatment notes cannot reasonably be characterized as "positive." (*See* Doc. No. 25-4.) In addition, the plaintiff is correct that the ALJ engaged in egregious cherry-picking, focusing only on those aspects of the treatment record that supported her opinion and ignoring any part that did not support her determination that the plaintiff was not disabled during the insured period. The most obvious example of this is her decision to accord "some weight" to Dr. Ruder's 2002 opinion that the plaintiff had responded well to treatment, utterly ignoring the fact that the plaintiff attempted suicide shortly after he was last seen or treated by Dr. Ruder and just days before Dr. Ruder actually issued his opinion. Further, the ALJ chose to rely heavily on evidence of events outside the insured period that supported her opinion but refused even to consider evidence from outside the insured period that tended to support a conclusion that the plaintiff was disabled by his psychiatric condition. Likewise, as the plaintiff argues, much of the evidence that the magistrate judge found to support the ALJ's opinion concerns events that occurred outside the insured period, specifically including the plaintiff's participation in the co-op and his traveling to pipe shows to attempt to sell pipes.

For these reasons, the court rejects the R&R's conclusion that substantial evidence supports the ALJ's finding that Dr. McFerrin's "highly restrictive medical opinions" were "inconsistent with the record as a whole, particularly given that the record shows that the plaintiff was able to work, study online and under a master pipe maker, and travel around the country for his pipe

making business, which clearly shows his ability to plan, focus, carry out tasks, and interact with others was no more than mildly or moderately limited." (AR 45.) The court cannot find, based on all of the evidence in the record, that the plaintiff's activities during the insured period from September 2006 through December 2009 were inconsistent with Dr. McFerrin's opinion that he was not able to maintain any consistent work during that time period. Indeed, the evidence shows that the plaintiff remained hopeful that he would be able to return to work, but, as Dr. McFerrin observed, his job attempts failed over and over again, because his psychiatric condition interfered with his ability to maintain regular work of any kind. None of the activities in which he did engage is remotely comparable to a job; specifically, his ability to engage in a limited way in the pipe repair and pipe making endeavor is not representative of a functional capacity to hold a full-time job.

As set forth above, if the opinion of the treating physician as to the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," then it must be accorded controlling weight. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting *Wilson*, 378 F.3d at 544). In this case, the ALJ erred in finding that Dr. McFerrin's opinions as to the nature and severity of the plaintiff's condition were not supported by medically acceptable objective evidence, as the R&R found. In addition, however, the ALJ and the R&R both erred in concluding that Dr. McFerrin's opinions were inconsistent with other substantial evidence in the record. There is simply no evidence in the record regarding the plaintiff's activities *during the insured period* that cannot be reconciled with Dr. McFerrin's opinions. The ALJ was required by the evidence in this record to give Dr. McFerrin's opinions controlling weight, and her failure to do so constitutes reversible error. Moreover, even if they

were not entitled to controlling weight, the opinions were deserving of substantial weight, as there is no countervailing medical evidence in the record to contradict them.

In sum, in light of all the foregoing, the court finds that the ALJ's determination that the plaintiff was not disabled during the relevant period is not supported by substantial evidence. Accordingly, the court must determine whether to reverse and remand the matter for rehearing or to reverse and order an award of benefits. Under 42 U.S.C. § 405(g), the court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Wiser v. Comm'r of Soc. Sec.*, 627 F. App'x 523, 527 (6th Cir. 2015) (affirming the district court's judgment vacating the ALJ's finding of non-disability and remanding for further consideration, where, although "proper evaluation of the treating source opinions and evidence" might result in a finding of disability, the evidence was not undisputed so an immediate award of benefits was not warranted); *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 467 (6th Cir. 2012) (finding "that all factual issues have been resolved and that the record adequately establishes Dragon's entitlement to benefits"); *Martin v. Commissioner*, 61 F. App'x 191, 201 (6th Cir. 2003) (reversing and remanding to the district court with instructions to award benefits where the opinions of the treating physicians, being uncontradicted, were "entitled to complete deference" and, as a result, that "proof of disability [was] strong and there [was] no evidence to the contrary").

In this case, proof of disability is strong and the opinions of Dr. McFerrin are effectively uncontradicted and, as such, entitled to complete deference. The court will therefore vacate the ALJ's finding of non-disability and enter an order awarding DIB for the insured period.

## IX.    CONCLUSION

For the reasons set forth herein, the court accepts and adopts in part the R&R but rejects the ultimate conclusion that substantial evidence supports the ALJ's non-disability determination. The court will enter an order vacating the ALJ's determination, granting the plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 12), and awarding DIB from his alleged onset date of September 22, 2006 through his last-insured date of December 31, 2009.

_____
ALETA A. TRAUGER
United States District Judge